DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Ottawa County Court of Common Pleas that found in favor of appellee on his claims for fraud and violations of the Ohio Consumer Sales Practices Act. For the following reasons, the judgment of the trial court is affirmed in part and reversed in part.
 {¶ 2} The facts giving rise to this appeal reach back nearly six years. Following are the undisputed facts relevant to the issues raised on appeal. In May 2001, a 51-foot Sea Ray 510 luxury motor boat was delivered from the factory to appellant MarineMax of Ohio, Inc. ("MarineMax"). Several weeks later, one of appellant's employees took the boat out for a "sea trial" and ran the boat into a reef. Appellant immediately returned the boat to the Sea Ray factory in Florida to be repaired. Sea Ray made repairs costing more than $76,000 and returned the boat to MarineMax in September 2001. MarineMax inspected the boat, determined that it had been repaired satisfactorily, and placed it in winter storage. In April 2002, while the boat was still in storage, Karl Oreskovich, appellant's service manager, noticed cracking in the gel coat of the engine "stringers." According to testimony at trial, "stringers" are the "backbone" of a boat; they run parallel to the center line of the boat and are fastened to the bottom, providing reinforcement and rigidity. Oreskovich contacted Sea Ray, and the manufacturer arranged for the boat to be repaired locally. Sea Ray was billed $22,507 for those repairs. The boat was returned to MarineMax and cleared for sale in July 2002.
 {¶ 3} On Friday, August 2, 2002, appellee Douglas Borror, an experienced boater, visited MarineMax and took the 51-foot Sea Ray 510 for a test ride. Afterward, salesman Mark Walker told Borror the boat had been damaged during its initial sea trial and repaired and was therefore offered with an extended warranty. The parties disagree as to how much detail Walker gave Borror about the extent of the damage and how it occurred. Borror testified he was told the boat "hit a can" (buoy) by the reef. Salesman Walker testified he told Borror the boat hit the reef by the buoy. Upon learning of the damage, Borror indicated he wanted to talk to Oreskovich about the boat's condition. Oreskovich was on vacation, however, and the parties again disagree as to whether Borror talked to him that day or the next. Nevertheless, within an hour of speaking to Oreskovich, Borror agreed to purchase the boat. On August 9, 2002, Borror purchased the boat for $780,151.83 (including tax). Along with other purchase documents, Borror was asked to sign a document captioned "Disclosure Acknowledgement" which stated:
 {¶ 4} "In conjunction with the purchase of the boat listed below, as the purchaser, I hereby acknowledge that the following history of this boat has been disclosed to me."
 {¶ 5} After listing the boat's identification numbers, the document stated:
 {¶ 6} "* The boat sustained damage prior to my purchase.
 {¶ 7} "* The boat was returned to the manufacturer and repaired to factory specifications.
 {¶ 8} "* All normal factory warranties are in effect with a six (6) month extension of the Sea Ray limited warranty."
 {¶ 9} Appellant signed and dated the document. After the sale was completed, Borror took delivery of the boat and used it for approximately three weeks before putting it in dry storage for the winter.
 {¶ 10} Gregory Group, a marine surveyor who inspects boats to establish their condition and value, testified at trial that in October 2002, while he was surveying another boat stored near Borror's, he noticed that the boat was sagging slightly where the hull had been placed on a large wooden keel block. Group, apparently already aware of the boat's "history," suggested that more blocking be added. In January 2003, Borror hired South Shore Marine to wax the underside of his boat. Borror was contacted by an employee of South Shore Marine who told him that he found some problems with the bottom of the boat while waxing it. Borror immediately contacted Group, who told him that the boat had been grounded and severely damaged. He also told Borror that the boat's stringer system had suffered extensive damage and had undergone extensive repairs. Appellant maintains that this information contradicted what he had been told by Walker and Oreskovich.
 {¶ 11} Borror then hired Group to perform a survey of the boat. Group inspected the boat on January 31, 2003. Based on his inspection and knowledge of the boat's repair history, Group prepared a seven-page report in which he noted, among other findings, six areas of "existing damage and/or extremely poor repair" to the exterior and interior hull; pockets of elevated moisture in the deck, and "copious" leaking of crankcase oil from the starboard engine, which he stated is unusual for an engine with little use but not unusual for an engine that has been run aground "at speed." Group offered his opinion that the true scope of structural damage had not been assessed because only those areas that were readily accessible in the engine compartment were inspected and repaired.
 {¶ 12} Group concluded that the boat was not seaworthy or otherwise fit for use as a recreational sport yacht. He further stated that when Borror purchased the boat, it was worth only $300,000. This conclusion was based on the deficiencies outlined in the report, "* * * the wrecked and repaired condition of the hull, the failure of the repairs at the bottom and stern, and the necessary repairs to the stern platform/lift." Borror did not use the boat again.
 {¶ 13} On March 17, 2003, Borror's legal counsel wrote a letter to MarineMax explaining that "because of the misrepresentations made concerning the quality and integrity of this boat, and its actual questionable safety," Borror was revoking his acceptance of the boat, making the boat available for MarineMax to take possession, and demanding a refund of the purchase price. In the alternative, Borror stated he was willing to select another boat of like quality from appellant's stock with the understanding that if the replacement boat cost less he would receive a refund for the difference between that price and what he paid for the Sea Ray 510.
 {¶ 14} Borror contends that MarineMax ignored his request, and on May 19, 2003, he filed a complaint against MarineMax and Mark Walker, the salesman who sold him the boat. (Borror's claims against Walker were eventually dismissed.) Borror asserted a claim for fraud, alleging that appellant knowingly made false representations regarding the damage to the boat and the repairs, and a claim alleging that MarineMax knowingly committed unfair, deceptive and unconscionable acts and practices in violation of the Ohio Consumer Sales Practices Act ("CSPA") in violation of R.C. 1345.01 et seq. Borror asserted a third count in which he claimed damages as a result of appellant's failure to honor his revocation of acceptance or refund the full purchase price as previously demanded.
 {¶ 15} On June 12, 2003, MarineMax and Walker filed an answer denying liability and stating that full disclosure was made to Borror regarding the damage to the boat and subsequent repairs. They further denied that Borror's March 17, 2003 letter constituted a valid revocation of his acceptance of the boat.
 {¶ 16} The record contains correspondence from appellant's counsel dated November 3, 2003, stating that it had hired its own surveyor, who indicated that the boat was seaworthy. MarineMax expressed its understanding that any further repairs that were necessary would be covered by the Sea Ray warranty. The company offered to do whatever was necessary to facilitate approval and completion of work done under that warranty and stated that its offer to complete all warranty work was unconditional and did not require Borror to release any of his legal claims. In a letter dated March 17, 2004, MarineMax again offered to handle the necessary repairs to the boat.
 {¶ 17} A three-day bench trial was held on May 2, 3, and 4, 2005. Pursuant to the court's request, the parties filed proposed findings of fact and conclusions of law on June 6, 2005. On September 12, 2005, the trial court filed its "Findings of Fact Conclusions of Law; Order." The issues before the trial court were whether MarineMax violated the CSPA by engaging in deceptive acts and practices regarding the sale of the boat to Borror and whether MarineMax engaged in fraud and deception, intentionally misleading Borror as to the severity of the damages to the boat.
 {¶ 18} First, the trial court concluded that MarineMax violated the CSPA and that Borror is entitled to treble damages. Specifically, the trial court found that MarineMax, "both implicitly and explicitly" represented that the vessel sustained only minor, non-structural damage and that Borror relied on the seller's assurances that the damage was minor. The trial court found that service manager Ken Oreskovich failed to tell Borror that the boat ran aground on a reef, sustained severe structural damage to its stringer system, and had undergone two rounds of repairs. The trial court further found that the Disclosure Acknowledgment did not set forth "critical facts" concerning the extent of the damage, how it occurred, and the repair history — information that would have put Borror on notice that additional investigation would be appropriate. The trial court concluded that the failure to disclose that information constituted a deceptive act. As to Borror's revocation of the sale, the trial court found that his actions were justified in so doing and that appellant's refusal to accept the revocation was an additional violation of the CSPA.
 {¶ 19} As to damages pursuant to the CSPA, the court found that Borror originally paid $780,151.83 for the boat and sold it in March 2004 for $350,000. The difference between those two figures ($430,151.83) was added to $54,439.44 which the trial court determined appellant incurred as expenses related to the boat, for a total of $484,591.27 in actual damages. Three times the actual damages results in a total amount of $1,453,773.81.
 {¶ 20} The trial court further found that MarineMax engaged in common-law fraud and deception, intentionally misleading Borror as to the severity of the damage to the boat. The trial court found that Borror was entitled to punitive damages of $484,591.27, which is equal to the amount of actual damages, because the wrong committed was "conscious, deliberate, intentional, malicious, deceitful, and particularly gross and egregious."
 {¶ 21} Additionally, the trial court determined that Borror was entitled to attorney fees under the CSPA and fraud claims and set the matter for hearing on October 10, 2005, to take evidence as to the work "reasonably performed" by Borror's attorneys.
 {¶ 22} On February 15, 2006, the trial court filed its decision and order as to attorney fees and an order as to Borror's motion for prejudgment interest. Regarding attorney fees, the trial court reiterated its earlier finding that appellant knowingly committed an act or practice that violated the CSPA when it failed to disclose the extent of the structural damage to the boat and refused to accept appellee's revocation of the boat. The record reflects that Borror sought attorney fees of $181,850.75 and asked the trial court to modify the amount upward by the application of factors listed in DR 2-106(B) and the law set forth in Bittner v. Tri-County Toyota, Inc. (1991),58 Ohio St.3d 143. In its decision, the trial court noted that appellant did not object to the reasonableness of the hourly rates, expenses and number of hours charged, with the exception of $2,421 charged for paralegal work. The court also noted that appellant objected to the award being modified upward. The trial court concluded that Borror was entitled to charge for reasonable expenses related to the work performed by a paralegal. Additionally, the trial court modified the award of attorney fees that was based on the "lodestar"[1] amount upward by $240,000 for a total award, after reasonable expenses were added, of $484,727.43.
 {¶ 23} Finally, as to Borror's motion for prejudgment interest, on February 15, 2005, the trial court found that Borror was entitled to prejudgment interest on the entire judgment, excluding punitive damages, to be calculated from the date the cause of action accrued to the date on which the judgment was rendered.
 {¶ 24} It is from the judgments summarized above that appellant now appeals, setting forth the following assignments of error:
 {¶ 25} "I. The trial court erred and misapplied Ohio's Consumer Sales Practices Act (CSPA) when it concluded that the plaintiff rescinded the sales contract but awarded trebled, contract damages.
 {¶ 26} "II. The trial court erred and abused its discretion when it awarded attorney's fees under the CSPA; even if a reasonable attorney fee could be awarded, the trial court erred and abused its discretion when it awarded `enhanced' fees exceeding $420,000.
 {¶ 27} "III. The evidence is insufficient, as a matter of law, to support a claim of fraud, much less egregious fraud, punitive damages, and attorney's fees; even if supported by some evidence, the trial court's findings of fraud and egregious fraud are unsupported by the manifest weight of the evidence, and tainted by `facts' that appear nowhere in the record.
 {¶ 28} "IV. Alternatively, the trial court erred when it awarded punitive damages in addition to trebled damages, and after plaintiff abandoned his claim for punitive damages, and in its calculation of attorney's fees.
 {¶ 29} "V. The trial court erred and abused its discretion when it awarded prejudgment interest."
 {¶ 30} Appellant presents two arguments in support of its first assignment of error. First, appellant asserts that the trial court erred by awarding contract damages because Borror had elected to void the contract in his March 17, 2003 letter to appellant. Appellant argues that Borror's actions in rescinding the purchase contract in his letter constituted a binding election of CSPA remedies and that he could not thereafter revive the contract and seek actual or treble damages.
 {¶ 31} Appellant argues repeatedly that Borror rescinded the purchase contract. However, the record reflects only that Borror attemptedto rescind; he demanded rescission in his March 2003 letter to appellant and appellant refused the request, offering to make further warranty repairs on the boat. By early 2003, Borror had already taken possession of the boat, paid for it and used it for three weeks. He did not return the boat or discontinue payment. When appellant refused to allow Borror to rescind, which was before the complaint was filed, Borror pursued recovery of his damages. At the time this matter went to trial, rescission was no longer an option or issue since Borror had sold the boat by then. Further, in its Proposed Findings of Fact and Conclusions of Law, ¶ 1, appellant stated that Borror had "voluntarily dismissed with prejudice his claim for revocation of acceptance of the boat * * * as originally set forth in his Complaint." Appellant also acknowledged that "during the trial of this action, Plaintiff advised the Court of * * * the dismissal of his revocation of acceptance claim * * *." It is clear from the record that the trial court did not "find rescission and award contract damages" as appellant claims. This argument is without merit.
 {¶ 32} Appellant also argues that the trial court's finding that MarineMax violated the CSPA is against the weight of the evidence. In support, appellant asserts that the "overwhelming evidence" shows a "breakdown in communication" rather than deceit on the part of MarineMax or its agents. Appellant stresses that Borror testified that he heard the salesman say that the boat had hit a can (buoy) by the reef, while the salesman testified he told Borror the boat had hit a reef by the green can. In further support of this argument, appellant cites testimony of service manager Oreskovich, who stated he thoroughly inspected the boat before and after the second round of repairs, observed the repairs being made, and believed that the boat was fully repaired.
 {¶ 33} Our standard of review on manifest weight of the evidence issues in a civil case is whether there is some competent, credible evidence in support of the trial court's decision. CE. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 34} An appellate court generally must presume that the findings of the trier of fact are correct. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 79-80. The trier of fact is in the best position to make factual findings, since it has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed on appeal through the written record. Id.; Miller v.Miller (1988), 37 Ohio St.3d 71. "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Seasons Coal Co., supra, at 81. See, also, State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 35} R.C. 1345.02(A) provides that "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section when it occurs before, during or after the transaction." It is undisputed that, as defined by R.C. 1345.01, Borror was a consumer, appellant was a supplier, and the sale of the boat to Borror was a consumer transaction. Appellant disputes that it intended to deceive Borror as to the extent of damage to the boat and the nature of the repairs.
 {¶ 36} In its September 2005 order, the trial court found that appellant held out the boat to have sustained only minor, non-structural damage. The court found that Borror took possession of the boat without discovery of the problems because discovery was difficult, since it was in the water from the time he first looked at it until he decided to purchase it. The trial court further found that the Disclosure Acknowledgement failed to set forth "critical facts" as to the damage and repairs, "all of which would have put Plaintiff on notice that additional investigation would be appropriate."
 {¶ 37} Proof of intent to deceive is not required to establish a violation of R.C. 1345.02. It is sufficient that the conduct complained of "has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts." Funk v. MontgomeryAMC/Jeep/Renault (1990), 66 Ohio App.3d 815, 823. Citing a decision of the Twelfth District Court of Appeals, the trial court in this case noted that "[t]he place to look to determine the presence of deception is the state of mind of the consumer and not the intent of the supplier." Thompson v. Jim Dixon Lincoln Mercury, Inc., (Apr. 27, 1983), 12th Dist. No. 82-11-0109.
 {¶ 38} Borror testified that after he test drove the boat, he asked salesman Mark Walker why such a nice boat had not been sold already. He stated Walker told him it had hit a can by the reef and had been sent back to the factory for repairs. Borror testified that Walker told him that because of the damage, they would extend the warranty six months. Borror stated that Walker pointed to the starboard side of the boat and said it was hit along that side. He testified that the boat looked fine. Borror told Walker that since the boat had been damaged and sent back to Sea Ray, he wanted to talk to service manager Karl Oreskovich, whom he had known for several years and trusted. At no time did Walker tell Borror the boat had been grounded on the reef or mention anything that would suggest that the boat had suffered stringer damage or any other structural damage. Borror testified that he spoke to Oreskovich the following morning by phone and asked him what condition the boat was in at that time. Oreskovich told him that after the boat was returned from the factory he realized it needed additional repairs. Oreskovich said he had the boat worked on locally and that there was nothing to prevent Borror from buying it. He did not tell Borror the boat had been grounded, the transmission replaced, propeller shafts repaired and stringer broken. After speaking with Oreskovich, Borror purchased the boat.
 {¶ 39} Borror testified that the disclosure acknowledgment did not specify the extent of the damage to the boat and that he thought it referred to the damage Walker told him about the first time he saw the boat. He further testified that he would not have purchased the boat if he had been told the truth about the damage. Borror explained that he learned of possible problems with the boat when the person he hired to prepare it for the coming season suggested he have someone take a look at damage he noticed on the bottom and some other things wrong with it. At that point, Borror hired Group, the surveyor, to inspect the boat. He further testified that when he was offered the extended warranty he did not think it was intended to cover structural damage done to the stringer.
 {¶ 40} Debbie Halsey, a friend of Borror's daughter Danielle, testified that she was with Borror and his daughter when they first looked at the boat. Halsey testified that she heard the salesman say that the boat had hit a can and had been repaired. She did not hear Walker say that the boat had been run aground or hit a reef.
 {¶ 41} Danielle Borror testified that she heard Walker tell her father that the boat had hit a can and had been fixed. She did not hear any mention of the boat being run aground or other damage.
 {¶ 42} Steve Lenthe, an employee of MarineMax, testified that he was taking the boat for a test drive when it was damaged. Lenthe stated he hit a reef, not a can, at almost full speed. After he returned the boat to the harbor and it was pulled from the water, he could see that the props, rudders and gel coat were damaged.
 {¶ 43} Greg Group, the marine surveyor, testified that Borror hired him to inspect the boat. He testified in detail as to his findings after he inspected the boat on January 31, 2003. Group stated that after his inspection he concluded the boat was not seaworthy based on the existence of extensive repairs, unrepaired damage, and "vast areas" of the boat he was unable to inspect and that did not appear to have been inspected to determine whether or not there was additional damage. Group testified that he spoke with Oreskovich sometime after he inspected the boat and Oreskovich indicated that "the boat had hit a can." He later spoke in passing to Oreskovich, who then told Group that he did not intend to say that the boat hit a can but intended to say it hit "out by the can." Group also testified that after his inspection he determined the boat was worth approximately $300,000 based on its history of damage and repairs.
 {¶ 44} Stephen Knox, a certified marine surveyor specializing in damage survey and accident investigation, offered his opinion that a properly repaired boat does not suffer any loss in fair market value for a fully informed buyer. Knox, who surveyed Borror's boat before he sold it, stated that he considered it seaworthy after the repairs. Knox testified that he disagreed with conclusions Group reached in his report with regard to the quality of the repairs and the extent of damage to the hull. He also expressed his opinion that Group grossly undervalued the boat after the repairs were done.
 {¶ 45} Mark Walker, a salesman at MarineMax at the time Borror purchased his boat, testified that when he worked for Marine Max he was instructed not to use Group for surveys of used boats because the company believed Group was prejudiced against Sea Ray boats. Walker testified that after Borror first looked at the boat he told Borror the boat had hit a reef and had been through two rounds of repairs. He then put Borror in touch with Oreskovich to further discuss the boat's history.
 {¶ 46} Ken Oreskovich testified that he looked at the boat after the second round of repairs and saw no problems or anything left unrepaired. He did not believe there were any structural deficiencies at that time. Oreskovich testified as to his brief telephone conversation with Borror in August 2002, after Borror first saw the boat. Oreskovich stated he told Borror the boat was run aground in 2001, and said he told Borror there was "some pretty good damage to the bottom of it." He testified that he told Borror the boat was returned to Sea Ray and repaired further after that because the Sea Ray repairs were not adequate. He further testified that Borror's main concern was how the boat was repaired as opposed to the accident or the damage. Oreskovich stated he did not try to deceive Borror and was not aware of any suggestion from MarineMax that he hide the details of the boat's history. He had seen photographs of the damage to the boat but did not offer to let Borror see them because "[i]t wasn't asked of me." He further testified that MarineMax had not been asked to provide warranty service on the problems Borror claimed existed with the boat. Oreskovich explained that after the initial repairs, delamination was discovered on the engine stringers which led to the second repair job. He stated that when that happens to the inboard and outboard stringers, the boat is not structurally sound. Oreskovich testified he was aware that when Tim Mills began to repair the boat in 2002, Mills found damage that had not been addressed by Sea Ray during the initial repairs.
 {¶ 47} This court has thoroughly reviewed the record of proceedings in the trial court. Based thereon, we find that there was competent, credible evidence before the trial court to support its decision that appellant held out the boat to have sustained only minor, non-structural damage and thereby committed an unfair or deceptive act. The trial court's application of the Consumer Sales Practices Act to the facts of this case was proper. This court must presume that the findings of the trier of fact are correct; a difference of opinion as to the credibility of witnesses and evidence is not a legitimate ground for reversal. SeeSeasons Coal Co., supra.[2]
 {¶ 48} Based on the forgoing, appellant's first assignment of error is not well-taken.
 {¶ 49} In its second assignment of error, appellant asserts the trial court erred by finding a knowing violation of the CSPA, which is required for an award of attorney fees, and abused its discretion by awarding enhanced attorney fees exceeding $420,000. Appellant argues that even if reasonable fees were justified, the court erred by enhancing them.
 {¶ 50} This court has already affirmed the trial court's finding that appellant committed a deceptive act in violation of the CSPA. The trial court found further that "one can knowingly do an act without knowing that the act is in violation of the law." [Brooks v. HurstBuick-Pontiac-Olds-GMC, Inc. (1985), 23 Ohio App.3d 85]. In Einhorn v.Ford Motor Company et al. (1990), 48 Ohio St.3d 27, the Supreme Court of Ohio found that the legislative purpose of R.C. 1345.09(F)(2) is best safeguarded "by finding that `knowingly' committing an act or practice in violation of R.C. Chapter 1345 means that the supplier need only intentionally do the act that violates the Consumer Sales Practices Act." Einhorn at 30. The court further found that "[t]he supplier does not have to know that his conduct violates the law for the court to grant attorney fees." Id. The trial court in the case before us concluded that appellant knowingly violated the CSPA when it failed to disclose the structural damage to the boat and also when it refused to accept Borror's revocation of the sale. The trial court's findings allowed it to award Borror reasonable attorney fees, including expenses.
 {¶ 51} Appellant next argues that the trial court's award of enhanced attorney fees was an abuse of discretion. To determine a "reasonable" fee as allowed by R.C. 1345.09(F), the trial court first calculates the number of hours reasonably expended on the case times an hourly fee. The trial court then may modify that figure by applying factors listed in DR 2-106(B). See Bittner v. Tri-County Toyota, Inc. (1991),58 Ohio St.3d 143, syllabus. Following the three-day bench trial, Borror submitted a fee request of $181,850.75. MarineMax did not contest that figure, with the exception of $2,421 in fees generated by a paralegal and law clerk. MarineMax objects to the trial court's decision to enhance the fee by $240,000 based on factors set forth in DR 2-106(B).
 {¶ 52} The trial court made numerous findings related to the application of the factors set forth in DR 2-106(B). In support of its decision to modify the attorney fees upward, the trial court considered the time and labor involved as well as the experience and professional skills of Borror's attorneys. The trial court found that the issues in the case were novel and difficult; plaintiffs counsel performed "exemplary" legal services; the lodestar was inappropriate in light of the difficulty in ascertaining an appropriate fee for legal services of this type; and appellant's offer of $35,000 to settle in response to Borror's $900,000 settlement demand was so inadequate that Borror was left with no choice but to proceed to trial.
 {¶ 53} Another key factor the trial court considered pursuant to DR 2-106(B) was whether the fee was fixed or contingent. In this case, when the lawsuit was initiated, Borror and his legal counsel agreed that fees would be paid on an hourly basis. However, on March 1, 2005, Borror and his attorneys entered into a contingency fee agreement which provided that as of April 1, 2005, attorney fees would be 50 percent of "all money and things of value recovered on behalf of [Borror] that exceeds the amount of $486,404.47." This provided for Borror to be made whole for his actual damages before paying his attorney fee obligation.
 {¶ 54} The trial court awarded fees and expenses of $484,727.43; this included the $181,850.75 lodestar, a $240,000 enhancement of the lodestar, and expenses of $62,877.43.
 {¶ 55} The trial court explained how it arrived at the enhancement of $240,000. The trial court reasoned that because approximately $120,000 of the lodestar was earned after Borror and his attorneys changed to a contingency fee agreement, Borror's counsel "risked" that amount by entering into the second arrangement. The trial court then doubled the $120,000 amount and added it to the $181,850.75 lodestar along with expenses.
 {¶ 56} A careful review of the trial court's separate decision and order as to attorney fees shows that the court's decision to enhance the fee award was heavily influenced by the fact that Borror and his attorneys entered into the contingency fee agreement. This court does not dispute that such an agreement may be used as a factor, among several others, to determine the reasonableness of attorney fees. SeeBrookover v. Flexmag Indus., 4th Dist. No. 00CA49, 2002-Ohio-2404; DR 2-106(B)(8). Ohio courts have not always followed that reasoning, however. This court held in Stacy v. Nationwide Mut. Ins. Co. (1998),125 Ohio App.3d 658, 672, that the trial court erred by using a contingent fee agreement to award attorney fees because it was unfair to hold a third party adversary to the terms of another's bargain. Additionally, the Supreme Court of Ohio has held that to award attorney fees to the prevailing party based on that party's contingent fee agreement with counsel constitutes an abuse of discretion. Landis v.Grange Mut. Ins. Co. (1998), 82 Ohio St.3d 339, 342-343.
 {¶ 57} In spite of Ohio cases rejecting the existence of a contingency fee agreement as a determining factor in the award of attorney fees, the trial court found that the fee agreement entered into by Borror and his counsel did not adequately reflect the merits of the claim and the difficulty of establishing those merits.
 {¶ 58} In further support of its decision, the trial court reasoned that, if this case had involved a commonly used contingency fee arrangement of one-third the amount recovered, that amount would be $646,121.67. The court further noted that the fee awarded of $421,850 represents only 21.9 percent of the amount recovered. The court stated that "It is this fact that warrants an enhancement of the lodestar' by counsel's assumption of the risk times a factor of two, or $240,000.00."
 {¶ 59} A trial court's determination as to the amount of attorney fees awarded for a knowing violation of the CSPA should not be reversed absent a showing that the court abused its discretion. Bittner, supra. An abuse of discretion is more than an error of judgment or law; it implies the trial court's decision is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1985), 5 Ohio St.3d 217, "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." Bittner, supra, at 146, quoting Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc. (1985),23 Ohio App.3d 85, 91.
 {¶ 60} In this case, Borror's attorneys were paid their hourly rate until just a few weeks before trial, when they negotiated the contingency fee agreement. A careful review of the record does not support either the trial court's finding that Borror's counsel "risked" $120,000 by entering into the contingency fee agreement or its decision to double that amount in calculating the total attorney fee award. As noted above, enhancement of attorney fees is within a trial court's discretion. We find, however, that an enhancement of the magnitude ordered by the trial court was not justified. We are troubled by what appears to be great weight given by the trial court to its conclusion that Borror's counsel took a "risk" by entering into the contingency fee agreement. Granted, if Borror had not prevailed on any of his claims, counsel would have collected only the fees earned before the new agreement was made. Such is the nature of a contingency fee agreement. We also acknowledge that the trial judge, after participating in the trial and numerous preliminary proceedings, was in a position to determine the value of services rendered by the lawyers who tried to case. Ohio case law tells us that where a court is empowered by statute to award attorney fees, the amount of such fees is within the court's sound discretion. Bittner, supra, at 146; Brooks, supra, at 91. The record does reflect that approximately $120,000 in legal services was rendered after entering into the contingency fee agreement. However, to simply take that number and double it appears to this court to have been arbitrary and without adequate justification. For the foregoing reasons, this court finds that the trial court's decision to enhance the award of attorney fees by $240,000 was an abuse of discretion. Accordingly, appellant's second assignment of error is well-taken.
 {¶ 61} In its third assignment of error, appellant challenges the trial court's finding that MarineMax committed an act of egregious fraud and its decision to award punitive damages, arguing that the decision was against the weight of the evidence.
 {¶ 62} To establish fraud, a plaintiff must prove:
 {¶ 63} "(a) a representation or, where there is a duty to disclose, concealment of a fact,
 {¶ 64} "(b) which is material to the transaction at hand,
 {¶ 65} "(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
 {¶ 66} "(d) with the intent of misleading another into relying upon it,
 {¶ 67} "(e) justifiable reliance upon the representation or concealment, and
 {¶ 68} "(f) a resulting injury proximately caused by the reliance."Burr v. Stark County Board of Commissioners (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.
 {¶ 69} Appellant argues that there was insufficient evidence to support a finding of fraud, much less egregious fraud. Alternatively, appellant argues that the trial court's findings are against the manifest weight of the evidence. While we agree the finding of egregious fraud was not supported by the evidence, we affirm the trial court's finding that appellant committed fraud.
 {¶ 70} The trial court found that Borror's fraud claim shared a common core of facts with the CSPA claim. We agree. The trial court's findings included the following: Oreskovich knew his representations were false in that they understated the degree of damage and were made with intent to deceive; the Disclosure Acknowledgement was made with intent to deceive, as evidenced by the omission of critical information; and Walker and Oreskovich intended for Borror to believe their statements and rely upon them when making his decision to purchase the boat. The trial court then found that punitive damages under the fraud claim were "altogether appropriate," despite Borror's statement that he would be satisfied with the damages from a CSPA violation, if trebled. The amount of punitive damages awarded was $484,591.27, which was equal to the actual damages. Further, having determined that Borror was entitled to punitive damages, the trial court found that he also was entitled to attorney fees under the fraud claim. However, there appears to have been no additional sum awarded over and above the $484,727.43 awarded under the CSPA claim. In its order, the trial court awarded Borror "attorneys fees pursuant to R.C. 1345.09(F)(2)."
 {¶ 71} In considering appellant's claims under this assignment of error, we are guided by the following standard of review: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." CE. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St. 2d 279.
 {¶ 72} For the following reasons, we find that the record supports the lower court's decision that fraud was demonstrated. Representations concerning how the boat was damaged, the extent of the damage, and its repair history were material to Borror's decision to purchase the boat. The most significant misrepresentation, in the opinion of this court, occurred through the bare-bones "Disclosure Acknowledgement" presented to Borror for him to sign at the time of the purchase. The "disclosure" stated that the boat had been returned to the manufacturer for repairs but, importantly, said nothing about the additional repairs required after it was discovered that all of the damage had not in fact been remedied by the manufacturer. The representations made by MarineMax were made falsely, clearly with knowledge of their falsity, with the intent of misleading Borror into relying upon them. Lastly, Borror justifiably relied upon those representations, which resulted in his economic injury.
 {¶ 73} Borror testified that had he known of the extent of the damage to the boat and its repair history, he would not have bought it. Therefore, had he not relied on appellant's representations, his subsequent damages would never have resulted. In summary, appellant knew it was concealing information about the boat, intended reliance, and in fact misled Borror to his detriment.
 {¶ 74} Based on the foregoing, this court finds that MarineMax committed fraud upon Borror. The trial court's finding is not against the manifest weight of the evidence. Having made that determination, we now consider appellant's assertion that the trial court erred by finding that MarineMax committed egregious fraud and ordering punitive damages.
 {¶ 75} The Ohio Supreme Court held in the third paragraph of the syllabus of Charles R. Combs Trucking, Inc. v. Internatl. HarvesterCo. (1984), 12 Ohio St.3d 241:
 {¶ 76} "In each case of alleged fraud the plaintiff, in order to be awarded punitive damages, must establish not only the elements of the tort itself but, in addition, must either show that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious."
 {¶ 77} Further, in weighing this issue, the United States Supreme Court has stated that it should be presumed a plaintiff has been made whole by compensatory damages, and punitive damages should be awarded only if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence.State Farm Mut. Auto. Ins. Co. v. Campbell (2003), 538 U.S. 408.
 {¶ 78} The infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, can warrant a substantial penalty. But all acts that cause economic harm do not constitute torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages. BMW of NorthAmerica, Inc. v. Gore (1996), 517 U.S. 559.
 {¶ 79} We find that Borror did not present any evidence which would elevate the fraud committed against him to the level we believe was contemplated by the court in Combs Trucking, supra. There was no evidence presented in addition to that needed to establish a basic case of fraud. Borror did not establish that the fraud was aggravated by malice or ill will on the part of MarineMax, nor did he demonstrate that the fraudulent inducement was "particularly gross or egregious." Accordingly, we find that the trial court erred by finding that appellant committed egregious fraud and by awarding punitive damages on the claim.
 {¶ 80} As appellant notes, this court in Brenner Marine, Inc. v.Goudreau (Jan. 13, 1995), 6th Dist. No. L-93-077, held that "an award of punitive damages in addition to the treble damages provided for under the Consumer Sales Practices Act" constitutes error as a matter of law. Ohio courts have held that a plaintiff may not obtain multiple recoveries for actual damages under different legal theories for the same conduct of a defendant. See Brenner Marine, supra; Hamlin SteelProducts, Inc. v. Bur. of Employment Serv. (1977), 54 Ohio App.2d 173. This court relied on Hamlin in Brenner Marine, wherein we concluded that the trial court erred by awarding punitive damages for fraud in addition to treble damages under the CSPA where the same facts supported both claims. A decision on this issue in this case would require a determination of whether the trial court awarded Borror damages for his actual loss on his CSPA claim and actual damages again via the punitive damages award on the fraud claim. However, we need not make such a finding here in light of our reversal of the trial court's award of punitive damages.
 {¶ 81} As to the trial court's decision that an award of attorney fees was justified on this claim, since there appears to have been no additional award actually ordered over and above the $484,727.43 awarded under the CSPA claim, this claimed error is without merit.
 {¶ 82} Based on the foregoing, appellant's third assignment of error is well-taken.
 {¶ 83} In its fourth assignment of error, appellant argues alternatively that the trial court erred when it awarded punitive damages in additional to the trebled damages and in its calculation of attorney fees. First, we note that while appellant's statement of its assignment of error refers to an error in calculation of attorney fees, its argument in support of its fourth assignment of error does not address that issue. Therefore, this court will not consider it. Next, we find that in light of our determination above that the trial court erred in awarding punitive damages, this assignment of error is moot.
 {¶ 84} In its fifth assignment of error, appellant asserts that the trial court abused its discretion when it awarded prejudgment interest. Appellant argues that the award of prejudgment interest punishes MarineMax for exercising its right to trial. Appellant claims it "vigorously" defended itself because it believed that its representatives were honest with Borror regarding the boat's history. MarineMax further asserts it did make a good faith settlement offer.
 {¶ 85} Whether to grant an award of prejudgment interest rests with the trial court's sound discretion. Scioto Mem. Hosp. Assn., Inc. v.Price Waterhouse (1996), 74 Ohio St. 3d 474, 479. Absent a clear abuse of discretion, a trial court's decision on the matter should not be reversed. Mobberly v. Hendricks (1994), 98 Ohio App. 3d 839, 845. Again, an abuse of discretion occurs where a court's decision is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore, 5 Ohio St. 3d 217.
 {¶ 86} In the instant action, prejudgment interest was awarded pursuant to R.C. 1343.03(C) which provides:
 {¶ 87} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based upon tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the partyrequired to pay the money failed to make a good faith effort to settlethe case and that the party to whom the money is to be paid did not failto make a good faith effort to settle the case." (Emphasis added.)
 {¶ 88} Whether a party has made a good faith effort to settle under R.C. 1343.03(C) is determined by whether he or she has: 1) fully cooperated in discovery proceedings, 2) rationally evaluated the risks and potential liability, 3) not attempted to unnecessarily delay any of the proceedings, and 4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. Kalain v.Smith (1986), 25 Ohio St. 3d 157, syllabus. All four criteria must be met. We stress that "whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court" and will not be overturned absent an abuse of discretion. Id. at 159. If, however, a party has a good faith, objectively reasonable belief that it has no liability, it is not required to make a settlement offer to avoid payment of prejudgment interest. Id. at syllabus; Edgerson v. ClevelandElec. Ilium. Co. (1985), 28 Ohio App.3d 24, 27-28. Egleston v. Fell
(Feb. 9, 1996), 6th Dist. No. L-95-127.
 {¶ 89} Borror filed a motion for prejudgment interest on September 23, 2005. Borror asserted he was entitled to prejudgment interest of $141,148.40, based on the boat having been purchased three years and 34 days before the trial court's decision and order. This was followed by a memorandum in opposition, reply and surreply. The trial court held a hearing on the matter on December 22, 2005, when the testimony of the parties' counsel was taken. Testimony regarding settlement negotiations revealed that Borror made one settlement demand of $900,000 during mediation on February 1, 2005. Appellant made a counter-offer of $35,000 on March 16, 2005. Borror did not counter that offer. Appellant's attorney testified that in mid-April he contacted Borror's attorney by telephone in an attempt to restart negotiations. He asked Borror's attorney if he would respond to the offer of $35,000 that had been made in March and said he had authority to negotiate. Borror's attorney indicated he did not consider appellant's offer "serious."
 {¶ 90} The trial court found that Borror was not obligated to make any additional monetary settlement offers. The court further found that appellant's offer was "so inadequate as to justify the termination of settlement discussions" and concluded that as such, appellant could not claim that it made a good faith effort to settle the case. In its order, the trial court did not calculate the amount of interest to be awarded or specify the applicable interest rates.
 {¶ 91} There is no shortage of case law in Ohio dealing with the issue of prejudgment interest. There have been many decisions, including some from the Supreme Court of Ohio, reversing a trial court's order when one of the parties failed to make a settlement offer. See, e.g.,Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638. Such was not the case herein, as Borror made the initial offer and appellant responded with a counteroffer. The issues in this case then become whether the trial court abused its discretion in determining that appellant's counteroffer was so inadequate as to justify the conclusion that it failed to respond in good faith, and whether the trial court was punishing appellant for exercising its right to trial. This court has held that it is "an injustice to penalize a party for exercising her right to trial." (Citations omitted.) Steele v. Diab (Dec. 3, 1999), 6th Dist. No. E-98-035. In Steele, the appellant had admitted she was negligent at the time of the automobile accident that gave rise to the case, but disputed that her negligence was the proximate cause of appellee's injuries, and the matter proceeded to trial.
 {¶ 92} We are mindful, however, of the holding of the Ohio Supreme Court in Moskovitz, supra, that the "ultimate decision whether to award prejudgment interest rests with the trial judge."
 {¶ 93} The trial court concluded that appellant failed to put forth evidence suggesting it made any offers that would constitute a reasonable basis for settlement discussions. It also found that Borror's demand was not unreasonable. The court thus rejected appellant's claim that it made a good faith effort to settle the case. Upon our review of the record, we are unable to find that the trial court was attempting to penalize appellant for exercising its right to a trial.
 {¶ 94} Based on the foregoing, guided by the clear message from the Ohio Supreme Court that the "ultimate decision" on this issue rests in the trial court's discretion, we are unable to find that the decision of the trial court in this case was an abuse of discretion. Accordingly, appellant's fifth assignment of error is not well-taken.
 {¶ 95} On consideration whereof, the judgment of the Ottawa County Court of Common Pleas is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this decision and judgment entry. The parties are ordered to pay equal shares of the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., William J. Skow, J., George M. Glasser, J. CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] The "lodestar" amount is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. In this case, the lodestar was $181,850.75.
[2] Appellant does not separately challenge the trial court's decision to award treble damages. Pursuant to R.C. 1345.09(B), actual damages proven, whether economic or noneconomic, are subject to trebling.Whitaker v. M.T. Automotive, Inc., 111 Ohio St.3d 177,2006-Ohio-5481.